## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

BUENA VISTA OCEANSIDE, LLC,                    Bankruptcy  No.: 11-24516 (JKF)
                                               Chapter 11
        Debtor.


BUENA VISTA OCEANSIDE, LLC,
        Movant.
                                               Related to Doc. No. 98 Motion for
                                               Valuation of Secured Claim and Avoidance
                                               of Lien Pursuant to 11 U.S.C. §506 and
                                               Federal Rule of Bankruptcy Procedure 3012

        v.


OPTIMUM BANK,
        Respondent.

## MEMORANDUM OPINION[1]


### INTRODUCTION

        The matter before this court is a Motion for Valuation of Secured Claim and Avoidance

of Lien filed by Buena Vista Oceanside, LLC (hereafter "Debtor").  On April 9th and 10th of

2012, a trial was held to hear evidence regarding the value of the Buena Vista Hotel and the

Courtyard Villa Hotel (hereafter "Properties").  The Properties are owned by the Debtor and are

operated as two small hotels located in Lauderdale-By-The-Sea, on El Mar Drive, Fort

Lauderdale, Florida.  Optimum Bank, the creditor in this matter, (hereafter "Optimum") has a

first priority mortgage lien on the Properties.

---

[1]The court's jurisdiction was not at issue.  This Memorandum Opinion constitutes our
findings of fact and conclusions of law.

1

**FACTS**

Debtor is a limited liability company that owns and operates the Properties.  The first of the two Properties, the Buena Vista, consists of fourteen units and is located across the street from the beach.  The second, the Courtyard Villa, consists of eight units and is situated on the beach front.

On or about November 30, 2005, Optimum made a loan to the Debtor in the amount of $4,368,000 evidenced by a Promissory Note executed by Debtor in favor of Optimum.  As security for repayment Debtor made, executed and delivered to Optimum a Mortgage Deed and Security Agreement.  Pursuant to the Mortgage, the Debtor granted Optimum a first priority mortgage lien on the Properties.[2]

Debtor commenced the above-captioned case by filing a voluntary petition for relief under chapter 7 on July 20, 2011.  On August 8, 2011, this court entered an order converting this case to a chapter 11.  Debtor is currently in possession of its assets and managing its affairs as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

On September 1, 2011, Optimum filed a Proof of Claim in the amount of $4,977,984.70, which was docketed as Proof of Claim # 1.  On October 5, 2011, the Debtor filed a Motion for Valuation of Secured Claim and Avoidance of Lien.  Motion for Valuation of Secured Claim and Avoidance of Lien, Oct. 5, 2011, ECF No. 98.  The motion sought a determination of the secured claim of the Debtor's senior lender, Optimum.  In response to the motion, this court ordered that

---

[2]A third property served as collateral for the mortgage but it was later sold with the proceeds applied to the debt.

the Debtor and Optimum each obtain an appraisal of the Properties for an opinion on the fair market value of the two hotels.  Order of Court, Oct. 11, 2011, ECF No. 109.  On January 3, 2012, this court entered an order stating, among other things, that the Proof of Claim "is hereby allowed in its entirety" and that "the secured portion of the claim will be determined in a separate valuation proceeding."  Order of Court, Jan. 3, 2012, ECF No. 159.

To prepare for the April 2012 Valuation Hearing, the parties hired professional appraisers.  Debtor retained Jesse Vance[3] (hereafter "Vance") who rendered an opinion on the market value of the Buena Vista as $770,000.  Debtor also used the opinion of Ronald Ames[4] (hereafter "Ames") who rendered separate opinions on the market value of the Buena Vista as $750,000 and the Courtyard Villa as $805,000.  Optimum retained Lawrence Pendleton (hereafter "Pendleton") who rendered an opinion on the value of the Buena Vista as $1,950,000 and the Courtyard Villa as $1,425,000.  Based on these appraisals, the Debtor asserts that the collective value of the Properties is $1,690,000 and Optimum asserts that the value is $3,375,000.

---

[3]Vance was initially retained to value both hotels, but the Debtor terminated his appraisal of the Courtyard Villa after Vance provided a preview of his selected comparable sales and informed the Debtor that he could not provide a draft report.  The Debtor's principal, Frank Zokaites, testified that he terminated Vance's appraisal because he was concerned that time was running out.  Trial Tr., 153:16-153:22, (Apr. 10, 2012), ECF No. 235.

[4]Ames was initially retained by an insider entity, Transamerican Trust and its trustee, Frank Zokaites.  Although the opinion of Ames was used by the Debtor, Transamerican Trust (which has made overtures related to funding a potential plan of reorganization) did not participate in the trial.

The experts submitted their reports prior to the trial and all three experts testified at trial regarding their opinions.[5]  The three experts are all MAI-certified appraisers,[6] and at trial the parties stipulated that Vance, Ames and Pendleton were all experts qualified to provide their opinions as to the value of the Properties.  The appraisal reports prepared by each of the experts were admitted into evidence by stipulation of the parties.[7]

All three appraisers utilized two methods to value the properties: the Sales Comparison Approach and the Income Capitalization Approach.  They agreed that the Cost Approach was not appropriate for this case.  This court concludes that the most reliable method for this particular property is the Income Capitalization Approach and will rely on that method in determining the value of the properties.[8]

**WEIGHT OF THE TESTIMONY**

---

[5]In addition to the testimony of the three experts, non-expert testimony was given by the Debtor's principal, Frank Zokaites (hereafter "Zokaites"), and the Debtor's manager, Robin O'Leary.

[6]MAI refers to being a Member of the Appraisal Institute.  Trial Tr., 72:21, (Apr. 9, 2012), ECF No. 233.

[7]After the trial ended, Debtor filed a Motion to Strike Lawrence Pendleton's Expert Reports and Opinions as to Fair Market Value.  Motion to Strike, May 22, 2012, ECF No. 246. At a hearing on June 13, 2012, the court denied the motion.

[8]While we have chosen to value the Properties using the Income Capitalization Approach, we have not entirely ignored the Sales Comparison Approach.  We have used the results obtained by the experts with the Sales Comparison Approach to check the reliability of the results of the Income Capitalization Approach.  The experts' results derived from both methods do not differ significantly from one another, further evidence that the Income Capitalization Approach produced reliable results when applied to the Properties in question.

While reviewing the opinions provided we keep in mind that courts are given "wide latitude" when determining the value of property. *In re 210 Ludlow Street Corp.*, 455 B.R. 443, 447 (Bankr. W.D. Pa. 2011). "[A] bankruptcy court is not bound by valuation opinions or reports submitted by appraisers, and may form its own opinion as to the value of property in bankruptcy proceedings." *Id*. Courts are permitted to give weight to all or only certain portions of an appraisal when making a determination as to value. *Id*. at 448. As such, this court will not rely on any of the experts exclusively, but will reconcile the evidence by making adjustments to each of the reports, as will be detailed below.

Although the parties stipulated to the experts' qualifications, they raised questions regarding the validity of each appraiser's opinion. This court has considered these questions in determining the weight accorded to each opinion, as the experts have presented the court with widely differing values.[9]

While the court sees minor flaws impacting the reliability of each appraiser's opinion, none are so severe that we find it necessary to reject any of the three opinions in toto. We have considered all of the evidence, evaluated each appraiser's numbers and examined each appraiser's rationale, including responses to questions posed by the parties regarding validity. Although we do not rely on any one appraiser exclusively, we find that certain aspects of the appraisers' opinions are more reliable than others. Thus, the court will utilize the Income Capitalization Approach as discussed by the experts and select the numbers and rates which best

---

[9]We find that Optimum's appraiser, Pendleton, has valued the Properties too high and the Debtor's appraisers, Vance and Ames, have valued the Properties too low.

estimate fair market value in a "piece-meal" manner.  The numbers and rates this court selects

are based on the appraisers' expertise, the market data they compiled, the research they

organized, the reliability of their determinations, their credibility and the condition of the

Properties subject to the appraisals.

**DEFERRED MAINTENANCE**

Before coming to a conclusion on the value of the Properties we will discuss the role of

deferred maintenance in the valuation process.  Deferred maintenance has been described by the

witnesses as work that should have been completed on particular property, but was not, and must

be completed in order to get that property back into good condition.  The costs of such

maintenance should be deducted from the value of the property to which it applies.  According to

*The Appraisal of Real Estate*, "deferred maintenance items typically require a lump-sum

adjustment in the sales comparison and income capitalization approaches because these problems

are specific to the subject property and would not be reflected in the values provided by

comparable sale or comparable rental properties."  Appraisal Institute, *The Appraisal of Real*

*Estate* 428 (13th ed. 2008).

Vance and Ames each made a deduction from their opinions of value based on what they

determined to be deferred maintenance.  Pendleton did not discuss deferred maintenance in his

reports; however, during his trial testimony he stated that a deduction for deferred maintenance

was necessary in order to accurately assign a value to a property.  Trial Tr., 31:15-31:20, 47:15-

48:15, (Apr. 10, 2012), ECF No. 235.  Thus, we will determine what constitutes deferred

maintenance at the Properties and what amount should be deducted from the final values for such maintenance.

The Appraisal of Real Estate explains deferred maintenance as a term that applies to items in need of immediate repair on the date of the appraisal. The Appraisal of Real Estate, at 427. They are generally relatively minor items that are 100% physically deteriorated or broken. Id. The broken item must be "curable," and it must be replaced or repaired in order for the building to continue to function as it should and be marketable to potential buyers. Id.

With these definitions and descriptions in mind, we first look at the Buena Vista. Vance and Ames deducted $140,000 and $200,000, respectively, from their values of this property. The major flaw at the Buena Vista is the non-functioning air conditioning system. This item is completely deteriorated but can be restored. We determine that the air conditioning is the only deferred maintenance at this hotel and Zokaites[10] testified that he would be able to restore that service for $125,000. Trial Tr., 43:6-43:9, (Apr. 9, 2012), ECF No. 233. We will therefore deduct $125,000 for deferred maintenance from the value of the Buena Vista.

We next look to the more complicated situation at the Courtyard Villa. In addition to the opinion of Ames, the Debtor hired Mr. Richard Zimmer (hereafter "Zimmer"), a professional engineer and construction consultant, who drafted a report discussing what repairs were necessary at the Courtyard Villa. Zimmer was deposed in preparation for trial. Zimmer Dep.,

---

[10]Zokaites has been in the construction and developing business for 39 years. Although he generally acts as a contractor or developer he testified that he is "also capable of doing most of the trades." Trial Tr., 18:2, (Apr. 9, 2012), ECF No. 233. He testified that he is "knowledgeable about construction and estimating costs[.]" Trial Tr. 18:17-18, (Apr. 9, 2012), ECF No. 233.

Mar. 5, 2012.   Although Zimmer did not appear at trial, his deposition testimony was submitted

in lieu of live testimony.  Trial Tr., 13:18-13:25, (Apr. 9, 2012), ECF No. 233.  According to the

evidence, the major concern at the Courtyard Villa is what this court will refer to as the "bowl"

problem.  The hotel essentially sits in a bowl, with higher ground on all four sides.  Trial Tr.,

36:8-39:3, (Apr. 9, 2012), ECF No. 233.  During heavy rain the bowl fills up and flooding of the

hotel occurs.  *Id*.

Ames initially determined that the cost of deferred maintenance for this property would

be $125,000.  After Ames submitted his report, Zimmer created his own report which contained a

list of sixteen "immediate repairs" needed at the Courtyard Villa.  According to Zimmer, the total

cost of these sixteen repairs would be between $253,300 and $383,200.  This estimate includes,

among other things, a new drainage system to remedy the problems caused by the "bowl."  He

estimated that the drainage system alone would probably cost between $150,000 and $250,000.

However, Zimmer suggested that in order to adequately amend the "bowl" problem, two

additional "immediate repairs" should be made.  He determined that it was necessary to re-roof

the second story, with new gutters and downspouts connected to the new drainage system, and to

repave and stripe the front parking lot.  These two repairs were estimated at a combined cost of

$28,000 to $35,000.  Zimmer Dep., 52:8-54:8, Mar. 5, 2012.  Combined with the new drainage

system, these three "immediate repairs" were estimated to cost between $178,000 and $285,000.

In response to Zimmer's report, Ames altered his opinion and determined that $250,000[11]

---

[11]Although Ames claims that he based his adjustment on Zimmer's report, he gives no
explanation as to why he selected $250,000 for deferred maintenance when Zimmer reported that
the "immediate repairs" would cost between $253,000 and $383,200.

should be deducted for deferred maintenance.   Ames Addendum, Ex. 34.  As mentioned above,

Pendleton did not consider deferred maintenance in his appraisals.  However, he testified that

some sort of deferred maintenance should be deducted from the value of the Courtyard Villa,

although he could not determine the exact amount and would not give an opinion on the Zimmer

report.  Trial Tr., 47:15-48:15, (Apr. 10, 2012), ECF No. 235.

After reviewing Zimmer's deposition testimony, as well as the testimony and reports of

Ames and Pendleton, the court credits the low end of Zimmer's estimate for the three necessary

repairs to the "bowl" problem.  Although Zimmer lists sixteen items which he considers

"Immediate Term Repairs," they do not all fit in the category of deferred maintenance.[12]

Therefore, we find that the amount of deferred maintenance to deduct from the value of the

Courtyard Villa is $178,000, attributable to making the three necessary repairs to the "bowl."

We will deduct that amount from our final value of the property.

**INCOME CAPITALIZATION APPROACH[13]**

_____

[12]Additionally, Zokaites testified that he made some repairs since Zimmer's report was
issued.  Four of the problems Zimmer addressed have been taken care of.  Trial Tr., 39:19-41:5,
(Apr. 9, 2012), ECF No. 233.

[13]We recognize that recently, in *In re Heritage Highgate, Inc.*, the Court of Appeals for
the Third Circuit discussed how bankruptcy courts should value collateral retained by a chapter
11 debtor in order to determine the amount of a creditor's secured claim.  679 F.3d 132 (3d Cir.
2012).  The appraiser in *Highgate* used the Sales Comparison Approach and the Income
Capitalization Approach in valuing a residential subdivision.  *Id*. at 136-137.  The appraiser
favored the Income Capitalization Approach "because it 'more accurately considered the time
and expenses' related to a real estate development like the Project."  *Id*.  The Court of Appeals
noted that "[t]he sales comparison approach and the income capitalization approach are two
techniques frequently used by appraisers in arriving at the fair market value of land."  *Id*. at 137
n.2.  When discussing the appraisal, the Court recognized that bankruptcy courts have the ability
to use the valuation approach that "best fits the circumstances of a particular case" and

As mentioned above, the court will rely on the Income Capitalization Approach[14] in determining the value of the properties.  Generally, with this approach "an investor looks at a proposed one-year income and applies a capitalization rate to it."  Trial Tr., 178:24-179:2, (Apr. 9, 2012), ECF No. 233.

The first step of this method is to project the Potential Gross Income (hereafter "PGI") to determine what the total potential income for each property would be at full occupancy.  This number is determined by selecting an Average Daily Rate (hereafter "ADR") attainable by the hotel.  The process involves analyzing the rental rates of the property concerned, as well as the rates of the most similar properties available in the subject market.

Once the PGI at 100% occupancy is determined a realistic occupancy rate must be selected.  This rate is derived by reviewing the rates in the market and the subject's actual vacancies.[15]

After the selected occupancy rate is applied to the PGI, the Net Operating Income (hereafter "NOI") is established by deducting operating expenses.  Operating expenses are "periodic expenditures necessary to maintain the real property and continue the production of effective gross income."  Vance Appraisal, Ex. 14, at 58.

---

determined that the reliance on the Income Capitalization Approach by the appraiser and the bankruptcy court was appropriate.  *Id*. at 141.

[14]The Income Capitalization Approach consists of two methods, direct capitalization and yield capitalization.  The appraisers all used the direct capitalization methodology which this court accepts.

[15]It has been nearly impossible to calculate the occupancy of the Buena Vista because the hotel is closed for a significant portion of the year in order to avoid expenses which vastly exceed revenue.

The NOI is then divided by the selected Capitalization Rate.  This is the "process of converting income into value."  Ames Appraisal 2011, Ex. 16, at 68.  The Capitalization Rate, properly estimated, evaluates the reasonableness of the subject's estimated income and expenses in the context of current and reasonably foreseeable market factors.  "The higher the risk the higher the rate you would use."  Trial Tr., 37:20-21, (Apr. 10, 2012), ECF No. 235.  Capitalization Rate data can be derived from national survey data and from local sales data, when available.  The selected Capitalization Rate is then applied to an estimate of the subject's NOI.  Once the Capitalization Rate is applied the projected value has been determined and deferred maintenance can be deducted, if necessary.

This basic formula was applied by each of the appraisers,[16] with slight variations, addressed below.  We have utilized this formula in determining the final value of the Properties.

**BUENA VISTA HOTEL**

The court finds that the most difficult part of the valuation process (and the biggest discrepancy between the parties) is the determination of the ADR.  However, based upon the evidence, the court finds that a fair and accurate PGI can be established by utilizing the ADR chosen by Optimum Bank's appraiser, Pendleton, and making a slight adjustment.  Pendleton's

---

[16]The appraisers used both the Income Capitalization Approach and the Sales Comparison Approach.  The values they arrived at using these approaches varied slightly and they each reconciled the two values to determine their final opinions.  When using the Income Capitalization Approach, Vance valued the Buena Vista at $772,000; Ames valued the Buena Vista at $785,000 and the Courtyard Villa at $745,000; Pendleton valued the Buena Vista at $1,900,000 and the Courtyard Villa at $1,400,000.  Using the Sales Comparison Approach, Vance valued the Buena Vista at $770,000; Ames valued the Buena Vista at $710,000 and the Courtyard Villa at $1,050,000; Pendleton valued the Buena Vista at $1,960,000 and the Courtyard Villa at $1,440,000.

ADR is based on average room rate data gathered by researching competitive lodging facilities in the market area.  He discovered that the Buena Vista's rates were generally higher than the lowest rates offered at comparable lodging facilities and selected a more reasonable figure.  He utilized a different rate for in season and off season rentals[17] and determined that in season the ADR should be $179 and off season it should be $99.  Although Pendleton's analysis is rational, the rates he selected are "rack rates."[18]  Ames' report, which we credit on this point, explained that in order to determine the ADR of a comparable property based on the comparable's "rack rates" the rate should be reduced by 10% to 20%, as that reflects the actual rents received.  We will therefore deduct 15% from the rates selected by Pendleton in order to more accurately project the rates achievable by the Buena Vista.   After deducting 15% from the ADR, at 100% occupancy, the PGI for the Buena Vista is $568,046.50.

We must next determine the appropriate occupancy rate for the Buena Vista.  Pendleton's research showed that in 2010 the average occupancy in the Broward County Lodging Segment, where the Properties are located, grew to 70.9% from 62.9% the year before.  Based on these numbers, he chose to use a 65% occupancy rate.  Ames also looked to Broward County for a determination of the occupancy rate.  According to Ames' research, from October 2008 through March 2011 the occupancy rates in Broward County were roughly between 63% and 68% as annual averages.  Ames selected a rate below the averages his own research disclosed and chose to use a 60% occupancy rate.

---

[17]Pendleton determined that in season consists of 145 days and off season, 220 days.
[18]A "rack rate" is the rate that a hotel advertises.  It is typically higher than the rates actually received by the hotel after discounts are applied.

Unlike the approach used by Pendleton and Ames, Vance utilized the actual occupancy at the Buena Vista, 30.84%, as well as the actual ADR. However, over the past few years it has been difficult to reasonably calculate the occupancy at the Buena Vista because it has been closed for several months during the off-season. We therefore accept the approach used by Ames and Pendleton which is based on market data. We accept the occupancy rate of 65% as chosen by Pendleton to be most credible and reasonable as it falls in the range of occupancy rates determined by both Pendleton's and Ames' research. Using our selected ADR and 65% occupancy rate, the projected room revenue is $369,230.23.

Pendleton increased the projected revenue by adding a category of "Other Revenues," which he describes as "a small amount of telephone revenue and other miscellaneous revenues." Pendleton Appraisal 2011, Ex. 19, at 45. However, the testimony does not support income from these items. Such revenues are too speculative and inconsistent to be added to the projected income at the Buena Vista. Thus, only room revenues will be included as income in our valuation.

The next step in the process is to determine the amount of operating expenses which must be deducted from projected revenue. According to Ames, the expense to income ratio rises with greater vacancies and especially with non-income producing space. The Buena Vista was not originally built as a hotel and was designed to be a corporate retreat. Trial Tr., 21:5-21:23, (Apr. 9, 2012), ECF No. 233. The hotel has areas of unused space, including several offices, conference rooms and social areas. Based on the zoning requirements in Lauderdale-By-The-Sea, this space cannot be turned into more rooms, or used as any facility open to the public.

13

There was disagreement as to whether the current rooms could be enlarged or the space could be used more effectively as a small gym or breakfast area.  Whether or not such renovations are feasible, some consideration must be given to the excess space in the hotel.

Ames' research showed that generally an expense to actual income ratio between 35% and 40% is characteristic of this market; however, he deducted 44.35% of the projected room revenue due to excess space.  Pendleton determined that the expenses are 53% of the projected revenues.  He adjusted the actual expenses compared to the gross income from 2009 and looked at the expenses of four comparable hotels.  The comparable hotels had expense to income ratios between 43% and 58%.  Vance utilized actual subject expenses from 2008 and adjusted and stabilized these numbers.  Like Ames, Vance also noted that the surplus building size at the Buena Vista leads to a higher expense to income ratio.  He determined that the expenses are 72.26% of the gross income, although he acknowledged that the most similar of his comparables had an expense to income ratio of 60%.

Prior to a deduction for operating expenses, Ames deducted $55,000 from the gross profit for "direct labor."[19]  He testified that this deduction is for payroll.  Trial Tr., 201:8, (Apr. 9, 2012), ECF No. 233.  Vance and Pendleton did not discuss payroll as a separate category, but they each deducted a greater amount for operating expenses.  Although this court takes payroll

_____

[19]Because Ames broke direct labor costs into a separate category, the deduction for direct labor was not included in Ames' calculation of the expense ($122,377) to room revenue ($275,900) ratio at the Buena Vista.  If we add the direct labor deduction and the calculation of operating expenses the total expenses are $177,377 and 64.29% of room revenue.  This number exceeds the 44.35% Ames cites as well as the rates characteristic of the market according to his research.  We also recognize that to calculate an expense to income ratio, Ames uses room revenue, not PGI like the other appraisers.

into consideration, and appreciated Ames' separate category for the expense, we will use the

method employed by Vance and Pendleton and will make all deductions from income through a

calculation of operating expenses.

In determining the operating expenses, we have considered market data and reviewed the

expense to income ratio for comparable properties as explained by the appraisers.  However, we

also considered the fact that the Buena Vista has unutilized space which results in a higher

expense to room revenue ratio.  Thus, the court determines that 60% of the gross income should

be deducted as operating expenses.  The 60% we have chosen is close to the high end of

Pendleton's research (58%) and matches the most similar of Vance's comparables.  This is a

deduction of $221,538.14 and establishes the NOI at $147,692.09.

Finally, we address capitalization.  The estimated NOI is capitalized by dividing it by an

appropriate Capitalization Rate.  According to Ames, who considered national and market trends,

a Capitalization Rate between 10% and 12% is an optimistic, but not unrealistic, expectation.

Ames chose to be highly optimistic using 10%.  Pendleton also contends that most Capitalization

Rates in the South Florida Hospitality market range from 10% to 12% and he selected a rate of

11%, which this court adopts.  We find that a 10% rate is too optimistic for this property,

recognizing that the property has excess space, is not beach front and does not have a swimming

pool.  Vance selected a 6% Capitalization Rate, which differs greatly from those selected by

Ames and Pendleton.  His rate is based on five comparable sales, not national and local market

trends.  We believe that a rate of 6% for this property is too low and, if applied to the numbers

selected by this court, the value of the Buena Vista would be unrealistic.

15

Applying the 11% Capitalization Rate, the estimated subject value is $1,342,655.36 and, as explained above, we will deduct $125,000 from the value for deferred maintenance.  The final value of the Buena Vista is $1,217,655.36.

The chart below displays and compares the numbers selected by the experts as well as those utilized by the court.

| Buena Vista | | | | |
|---|---|---|---|---|
| **Appraiser** | **Jesse Vance** | **Ronald Ames** | **Lawrence Pendleton** | **FINAL** |
| **Average Daily Rate In Season** | $181 (151 Days) | $90 | $179 (145 days) (Rack Rate) | $152.15 (145 days) |
| **Average Daily Rate Off Season** | $89 (214 Days) | $90 | $99 (220 days) (Rack Rate) | $84.15 (220 days) |
| **Projected Gross Income (at 100% Occupancy of 14 Units)** | $651,000 | $459,000 | $669,410 | $568,046.50 |
| **Occupancy Rate** | 30.84% | 60% | 65% | 65% |
| **Projected Room Revenue at Occupancy Rate** | $200,768 (Rounded to $200,800) | $275,900 | $435,116 | $369,230.23 |
| **Other Revenue** | $0 | $0 | $1,000 | $0 |
| **Direct Labor** | $0 | $55,000 | $0 | $0 |
| **Potential Gross Income** | $200,800 | $220,900 | $436,116 | $369,230.23 |
| **Operating Expenses** | $146,100 | $122,377 | $229,700 | $221,538.14 |

| Expense to Income Ratio | 72.76% of PGI | 44.35% of Room Revenue[20] | 53% of PGI | 60% of PGI |
|---|---|---|---|---|
| Net Operating Income | $54,700 | $98,563 | $206,416 | $147,692.09 |
| Capitalization Rate | 6% | 10% | 11% | 11% |
| Estimated Subject Value | $911,666 | $985,630 | $1,876,509 | $1,342,655.36 |
| As Rounded by Appraiser | $912,000 | $985,000 | $1,900,000 | $1,342,655.36 |
| Deferred Maintenance | $140,200 | $200,000 | $0 | $125,000 |
| Projected Value: | $772,000 | $785,000 | $1,900,000 | $1,217,655.36 |
| Difference: | $445,655.36 | $432,655.36 | ($682,344.64) | |

## COURTYARD VILLA

Only Ames, for the Debtor, and Pendleton, for Optimum Bank, appraised the Courtyard Villa. Like the Buena Vista, we find that the greatest difficulty in appraising this property is determining the ADR.

Pendleton again utilized a range of "rack rates" and compared them to the subject's actual rates from 2008 and 2009. He determined that an average rate of $120 off season and $200 in season is needed to stimulate growth in revenue and compete favorably with similar hotels in the area. Relying on these numbers, he applied a year round ADR of $152. We recognize, however, that this number represents a "rack rate," not a rate that is achievable by the Courtyard Villa. We

---

[20]See note 19, supra.

again apply Ames' estimation that ADRs are about 10% to 20% less than "rack rates" and we
will therefore deduct 15% from the ADR chosen by Pendleton.   A 15% deduction from $152
gives us an ADR of $129, which is close to the $125 ADR chosen by Ames.  This is a fair
assessment of a rate the property can achieve.  At 100% occupancy, the PGI for the Courtyard
Villa is $376,680.

We must next determine the appropriate occupancy rate.  Based on the research
completed by Ames and Pendleton,[21] as well as the evidence presented to this court regarding the
condition of this property and its proximity to the beach, we determine that an occupancy rate
slightly higher than the 65% we used for the Buena Vista will properly project the Courtyard
Villa's potential.  Thus, the 65% rate used by Pendleton is too low, and we will use the 70% rate
selected by Ames.

For the reasons we discussed when valuing the Buena Vista, we once again find no need
to consider other revenue.   Therefore, the projected room revenue is $263,676 from which we
must deduct operating expenses.  Pendleton projected that the expenses at the Courtyard Villa
should be about 47% of projected revenues.  Ames determined that the operating expenses

---

[21]Ames' research showed occupancy rates between 63% and 68% in Broward County
from 2008 through 2011.  Pendleton's research showed that in the last year rates went up from
62.9% to 70.9%.

18

should be 41.44% of the projected room revenue.[22]  Based on the market data[23] and the subject's

actual expenses, we determine that the operating expenses for the Courtyard Villa should be

equal to 50% of the room revenues.[24]  Therefore, both the operating expenses and the NOI are

estimated at $131,838.

The next step is to apply the Capitalization Rate.  We continue to use 11% based on the

national and market trends, which we discussed above.  Thus, the estimated value for the

Courtyard Villa is $1,198,527.27 from which we will deduct deferred maintenance in the amount

of $178,000 for the reasons explained above.  The final value for the Courtyard Villa is

$1,020,527.27.

The chart below details the valuation process utilized by this court and contains the

numbers selected by the experts.

| Courtyard Villas | | | |
|---|---|---|---|
| **Appraiser** | **Ronald Ames** | **Lawrence Pendleton** | **FINAL** |
| **Average Daily Rate In Season** | $125 | $152 (Rack Rate) | $129 |

---

[22]Like his calculations at the Buena Vista, Ames deducted $50,000 for direct labor in addition to $105,875 for operating expenses.  His calculation of operating expenses is 41.44% of the projected room revenue ($255,500), but this percentage excludes the deduction for direct labor.  If Ames' deduction for direct labor is worked into his estimation of operating expenses, the expenses are then equal to $155,875 and 61% of the projected room revenue.

[23]Ames' research showed that an expense to actual income ratio of 35% to 40% is characteristic of the market.  Pendleton looked at four comparable hotels and found the expense to income ratio to be between 43% and 58%.

[24]We note that, unlike the Buena Vista, the Courtyard Villa does not have the problem with excess space.

| | | | |
|---|---|---|---|
| **Average Daily Rate Off Season** | $125 | $152 (Rack Rate) | $129 |
| **Projected Gross Income (at 100% Occupancy of 8 Units)** | $365,000 | $443,840 | $376,680 |
| **Occupancy Rate** | 70% | 65% | 70% |
| **Projected Room Revenue at Occupancy Rate** | $255,500 | $288,496 | $263,676 |
| **Other Revenue** | $0 | $1,500 | $0 |
| **Direct Expenses** | $50,000 | $0 | $0 |
| **Potential Gross Income** | $205,500 | $289,996 | $263,676 |
| **Operating Expenses** | $105,875 | $135,000 | $131,838 |
| **Expense to Income Ratio** | 41.44% of Room Revenue[25] | 47% of PGI | 50% of PGI |
| **Net Operating Income** | $99,625 | $154,996 | $131,838 |
| **Capitalization Rate** | 10% | 11% | 11% |
| **Estimated Subject Value** | $996,250 | $1,409,055 | $1,198,527.27 |
| **As Rounded by Appraiser** | $995,000 | $1,400,000 | $1,198,527.27 |
| **Deferred Maintenance** | $250,000 (originally $125,000) | $0 | $178,000 |
| **Projected Value:** | $745,000 (originally $870,000) | $1,400,000 | $1,020,527.27 |
| **Difference:** | $275,527.27 | ($379,472.73) | |

[25]See note 22, supra.

20

**CONCLUSION**

Debtor asserts that the value of the Properties is $1,690,000 and Optimum asserts that the value is $3,375,000.  This court finds that the value of the Properties lies somewhere between these two numbers.  After reviewing the appraisal reports submitted by the experts, the testimony of the witnesses at trial and the deposition testimony of Zimmer we determine that the combined value of the Properties is $2,238,182.63.  Thus, Optimum Bank has a secured claim in the amount of $2,238,182.63 and an unsecured claim in the amount of $2,739,802.07.

An appropriate Order will be entered.

DATE: Dated: 8/16/2012
14:29:28

Judith K. Fitzgerald

cjs

Judith K. Fitzgerald
United States Bankruptcy Judge